UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAUF YEARDE,<br><br>                 Plaintiff,<br><br>     -against-<br><br>THE CITY OF NEW YORK; New York City Department of Correction ("DOC") Commissioner JOSEPH PONTE; DOC Chief of Department WILLIAM P. CLEMONS; Former DOC Deputy Commissioner of Investigations Division FLORENCE FINKLE; Warden FELENE BREELAND; Captain "JOHN" CAMACHO; Correction Officer "JOHN" ISNARDI; Correction Officer "JOHN" TATUM; Correction Officer "JOHN" JEFFERSON, and Correction Officers JOHN/JANE DOE #1-6,<br><br>                 Defendants. | **COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiff Rauf Yearde, by and through his attorneys Sarta & Scarpati, LLP and for his Complaint alleges as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff Rauf Yearde was so viciously beaten by correction officers at Rikers Island that he suffered a fracture of the humerus in his left arm. For several hours, correction officers and medical staff ignored his complaints of pain, until finally agreeing to evaluate Mr. Yearde's injuries and have him treated at Bellevue Hospital the following day.

2.    The events giving rise to this lawsuit occurred on October 30, 2014, when multiple correction officers entered Mr. Yearde's cell and brutally assaulted him, without provocation. The

beating left Mr. Yearde with a fractured left arm and bruising to his body including his genitals.  In the hours following the assault, Mr. Yearde complained repeatedly to Department of Correction ("DOC" or the "Department") staff that he felt severe pain in his left arm.  DOC staff ignored his pleas for medical assistance.  Mr. Yearde was subsequently taken to the facility clinic where he was told by the nurse to "Get out of my face, your arm is not broken" and was immediately sent back to a cell.  Only after Captain Hill encountered Mr. Yearde the following evening and witnessed the severe bruising and swelling of his left arm was Mr. Yearde taken back to the facility clinic for a further review at which time it was finally decided to send Mr. Yearde to Bellevue Hospital for assessment and treatment where his humeral fracture was finally diagnosed and treated.

3.      This brutal assault is yet another example of the endemic violence and excessive force that has plagued Rikers Island for decades—violence that Rikers Island officials have failed to remediate, despite widespread knowledge of these problems. Indeed, just two months before Mr. Yearde was caused to be beaten until his arm was fractured, the United States Department of Justice issued a report decrying the "deep-seated culture of violence" at Rikers Island.

4.      This civil rights complaint, arising from these outrageous and unlawful acts by DOC officers and officials, seeks compensatory and punitive damages, costs, and attorneys' fees pursuant to applicable state and federal civil rights law.

## JURISDICTION AND VENUE

5.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a). This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

7.      The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

8.      Plaintiff demands trial by jury in this action.

## PARTIES

9.      Rauf Yearde is a citizen of the United States. He resided at Rikers Island at the George R. Vierno Center ("GRVC") at Rikers Island in Bronx County at the time these events occurred.

10.     Defendant City of New York ("City") is a municipal corporation that, through the DOC, operates a number of detention jails. The DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders. In addition, senior officials in the DOC are aware of, and tolerate, certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture

of the DOC, constitute unwritten DOC policies or customs. The DOC is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

11.     At all times relevant hereto, Defendant Joseph Ponte was the Commissioner of DOC acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, Ponte, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and

conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, Ponte was also responsible for the care, custody, and control of all inmates housed in the Department's jails. In addition, at all relevant times, Ponte was responsible for enforcing the rules of DOC, and for ensuring that DOC personnel obeyed the laws of the United States and of the State of New York.

12.     At all times relevant hereto defendant William P. Clemons was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Chief of Department, he was the highest-ranking uniformed member of the DOC, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the DOC jails. He was also responsible for the care, custody, and control of all inmates in the DOC jails.

13.     At all times relevant hereto, Defendant Florence Finkle was the Deputy Commissioner of the Department's Investigation Division. As Deputy Commissioner, her responsibilities included supervising the investigation of any and all incidents in which any employee of the Department used force against any inmate, or was alleged to have used force, and recommending Department discipline against staff believed to have violated Department policies and rules, including those concerning use of force. Defendant Florence Finkle was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails.

14.     At all times relevant hereto, Felene Breeland was the Warden of GRVC within DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Warden, she was responsible for the care, custody, and control of all inmates, as well as the supervision of all staff, in GRVC.

15.     At all times relevant hereto, Defendant Captain "John" Camacho, whose first name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a supervising officer within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Camacho worked at GRVC on Rikers Island on October 30, 2014.

16.     At all times relevant hereto, Defendant DOC Officer "John" Isnardi, whose first name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Isnardi worked at GRVC on Rikers Island on October 30, 2014.

17.     At all times relevant hereto, Defendant DOC Officer "John" Tatum, whose first name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Tatum worked at GRVC on Rikers Island on or around October 30, 2014.

18.     At all times relevant hereto, Defendant DOC Officer "John" Jefferson, whose first name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Jefferson worked at GRVC on

5

Rikers Island on or around October 30, 2014.

19.    At all times relevant hereto, Defendant DOC Officer John Doe # 1, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 1 worked at GRVC on Rikers Island on October 30, 2014.

20.    At all times relevant hereto, Defendant DOC Officer John Doe # 2, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #2," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 2 worked at GRVC on Rikers Island on October 30, 2014.

21.    At all times relevant hereto, Defendant DOC Officer John Doe # 3, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #3," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 3 worked at GRVC on Rikers Island on October 30, 2014.

22.    At all times relevant hereto, Defendant DOC Officer John Doe # 4, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #4," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as

such, and acting under color of state law. Upon information and belief, Defendant John Doe # 4 worked at GRVC on Rikers Island on October 30, 2014.

23.     At all times relevant hereto, Defendant DOC Officer John Doe # 5, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #5," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 5 worked at GRVC on Rikers Island on October 30, 2014.

24.     At all times relevant hereto, Defendant DOC Officer John Doe # 2, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #2," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 2 worked at GRVC on Rikers Island on October 30, 2014.

25.      Defendants Isnardi, Tatum, John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5 and John Doe #6 are collectively referred to as the "Individual Defendants."

26.     Defendants Ponte, Clemons, Finkel, Breeland, and Camacho are collectively referred to as the "Supervisory Defendants."

## STATEMENT OF FACTS

### *New York City's Jails: A History of Abuse*

27.     As of the time Mr. Yearde was beaten, the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it, was

widely known and broadly reported. The Supervisory Defendants were well aware of these failures.

28.     For decades, through Department reports and civil litigation, the DOC has been aware of the routine, dangerous and unconstitutional use of excessive force by staff at individual facilities under the control of the DOC.[1]

29.     For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit ("CPSU"). That litigation unearthed evidence of abuse of prisoners and cover- ups that were sufficiently serious to merit criminal prosecution.

30.     In[1]gles v. Toro, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the pervasive practice of using excessive force against inmates incarcerated in New York City's jails. That litigation revealed significant numbers of credible excessive force complaints by prisoners who had been seriously injured by staff in the City jails. The settlement of that class action was intended to provide meaningful improvements in the training, practice, and supervision of DOC staff and investigators, and changes in the Department's use of force policy.

31.     In 2011, the City was named as a defendant in Nunez v. City of New York, No. 11 Civ. 5845 (S.D.N.Y.), a class action lawsuit that alleges widespread use of excessive force by correction officers at Rikers Island. The operative complaint in that suit once again placed the City on notice that "officers and captains" at Rikers "have inflicted brutal beatings on . . . inmates" and "have lied and coerced false statements to prevent the beatings from coming to light," while supervisors have created and perpetuated "a policy of permitting uniformed staff to use unlawful,

---

[1] *See, e.g.*, *Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988) (Correctional Institution for Men), *injunction entered*, 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990); *Jackson v. Montemagno*, No. 85 Civ. 2384 (E.D.N.Y.) (Brooklyn House of Detention); *Reynolds v. Ward*, No. 81 Civ. 101 (S.D.N.Y.) (Bellevue Prison Psychiatric Ward).

excessive force with impunity." Second Am. Compl., Nunez v. City of N.Y., No. 11

Civ. 5845 (S.D.N.Y. Sept. 4, 2012), ECF No. 34 ¶ 1.

32.     The United States Attorney's Office for the Southern District of New York has investigated the problem of excessive force by Department staff on Rikers Island, as have the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the Bronx District Attorney's Office, and the New York Times. Mark G. Peters, Commissioner of the Department of Investigation, condemned the "pattern of lawless conduct at Rikers that must be brought under control." The New York Times reported recently, after a months-long investigation, that "brutal attacks by correction officers on inmates" are "common occurrences" at Rikers and observed that "a dearth of whistle-blowers" as well as "reluctance of the city's Department of Correction to acknowledge the problem and the fact that guards are rarely punished" contribute to what the Times called a "culture of brutality on the island."

33.     Additionally, through DOC's elaborate reporting system, the Supervisory Defendants were aware of the pattern of a large number of incidents involving the use of unnecessary and/or excessive force by DOC staff members resulting in serious injuries to inmates but failed to take sufficient steps to curb these abuses.

34.     As of the time Mr. Yearde was beaten, the Supervisory Defendants were aware of the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it.

35.     In fact, since 2002, senior supervisors and uniformed staff in the DOC have been sued repeatedly by inmates alleging staff beatings.  Many of these cases, all resulting in favorable judgments for plaintiffs following settlement, include remarkably similar allegations of misconduct.

See, e.g.,

•     Reynolds v. City of New York, No. 11 Civ. 621 (S.D.N.Y.) (alleging beat-up in George Motchan Detention Center ("GMDC") resulting in shoulder fracture and loss of consciousness; settled for $200,500);

•     Mull v. City of New York, No. 08 Civ. 8854 (S.D.N.Y.) (alleging beat-up in AMKC resulting in diffuse axonal injury to brain, partial loss of eyesight, and partial loss of hearing, and requiring the victim to take seizure medications; settled for $550,000);

•     Belvett v. City of New York, No. 09 Civ. 8090 (S.D.N.Y.) (alleging beat-ups at GMDC and Robert N. Davoren Center ("RNDC") resulting in facial fracture; settled for $350,000);

•     Youngblood v. Baldwin, No. 08 Civ. 5982 (S.D.N.Y.) (alleging beat-up at GRVC resulting in skull laceration and broken nose; settled for $240,000);

•     Williams v. City of New York, No. 07 Civ. 11055 (S.D.N.Y.) (alleging beat-up in Otis Bantum Correctional Center ("OBCC") resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

•     Williams v. City of New York, No. 09 Civ. 5734 (S.D.N.Y.) (alleging beat-up in RNDC resulting in laceration to head; settled for $87,500);

•     Lee v. Perez, No. 09 Civ. 3134 (S.D.N.Y.) (alleging beat-up at North Infirmary Command ("NIC") resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

•     Shuford v. City of New York, No. 09 Civ. 945 (S.D.N.Y.) (alleging two beat-ups at RNDC resulting in facial fractures; settled for $375,000);

•     Diaz v. City of New York, No. 08 Civ. 4391 (S.D.N.Y.) (alleging beat-ups involving two inmates, one at AMKC and one at OBCC; settled for $400,000 and $450,000, respectively);

•       Lugo v. City of New York, No. 08 Civ. 2931 (S.D.N.Y.) (alleging beat-up at NIC resulting in orbital fracture; settled for $185,000);

•       Cuadrado v. City of New York, No. 07 Civ. 1447 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung; settled for $175,000);

•       Scott v. City of New York, No. 07 Civ. 3691 (S.D.N.Y.) (alleging beat-up at GMDC resulting in orbital fracture; settled for $175,000);

•       Pischeottola v. City of New York, No. 06 Civ. 2505 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung requiring chest tube; settled for $150,000);

•       Rice v. N.Y.C. D.O.C., No. 03 Civ. 582 (S.D.N.Y.) (alleging beat-ups of two inmates at GRVC resulting in collapsed lung and contusion hematomas in one case, and in neck and spinal cord injuries causing permanent stutter in the other; settled for $255,000 and $590,000, respectively);

•       Joseph v. N.Y.C. D.O.C., No. 02 Civ. 9219 (S.D.N.Y.) (alleging beat-up at GRVC resulting in orbital fracture; settled for $375,000).

36.      On information and belief, the number of incidents in which a use of force has resulted in a Class A injury (an injury requiring medical treatment beyond prescribing over- the-counter analgesics or administering minor first aid) to staff and/or inmates has steadily increased over the last several years. In 2008, there were 88 such incidents reported, followed by 109 incidents in 2009, 128 incidents in 2010, 142 incidents in 2011, and 147 incidents in 2012. According to the New York Times, 129 inmates suffered serious injuries in an 11-month period in 2013, and between August 2014 and January 2015, 62 inmates sustained serious injuries at the hands of officers.

37.      Cover-ups are also a part of DOC culture. For example, according to the New York

Times, DOC's own investigators produced a report in 2012, which concluded that Department staff, including the Warden and Deputy Warden of the RNDC, had participated or been complicit in the intentional falsification of statistics in order to create the false appearance that violence in the jail was declining. The report originally stated that "no legitimate explanation exists for the dramatic and inaccurate decreases in the number of inmate fights," and recommended that RNDC's warden and deputy warden be demoted because they "abdicated responsibility" and "failed to supervise, manage, or oversee the facility's reporting of violence statistics." Instead of demoting them, however, then-DOC Commissioner Dora Schriro ordered that the report be sanitized of any mention of their wrongdoing. The United States Attorney's Office, which was in the midst of investigating violence at the jail, received only the doctored report. When the cover-up was unearthed, the United States Attorney stated that such a cavalier attitude toward the truth "does not instill confidence in us that the City will quickly meet its constitutional obligations."

38.     The City and the Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in the City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

39.     Through all these cases and Department reports, the DOC and the Supervisory Defendants have been made aware of the widespread practice by DOC staff members of using excessive and/or unnecessary force to injure, and not restrain, inmates. They have also been made aware of the failure of DOC's Investigation Division to adequately investigate allegations of misconduct and of the de facto refusal of the Department to bring effective disciplinary charges against its officers, to promote institutional reform, and to protect the safety of prisoners confined in DOC custody.

40.     The Department has not taken sufficient steps to curb the abuse that occurs on a daily

basis in New York City jails. Rather, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

### *The October 30, 2014 Assault*

41.     On October 30, 2014, Mr. Yearde was incarcerated in the GRVC at Rikers Island.

42.      At the time, Mr. Yearde was 22 years old. He was a resident of the Bronx, New York.

43.      In the weeks leading up to the October 30, 2014 incident, Mr. Yearde was harassed by Correction Officers in GRVC.  On a daily basis, they verbally abused Mr. Yearde, denied him access to showers, denied him necessities such as tissues, and on at least two separate occasions, spit in his food.

44.      In the morning and afternoon of October 29, 2014, on two separate occasions, Correction Officers entered Mr. Yearde's cell verbally harassing him while they conducted searches of his cell, throwing his belongings around the room and conducting physical pat-downs, strip searches, and body cavity searches on him.

45.      Corrections Officers did not find any contraband on Mr. Yearde's person or in his cell on the two earlier searches of October 29, 2014.

46.      Subsequently, at approximately 8:00 PM on October 29, 2014, Correction Officers returned to Mr. Yearde's cell and ordered him to strip his clothing for the third time.

47.      Mr. Yearde refused a third search and explained that he had already been searched twice earlier, that no contraband had been recovered by the officers, and that he had not been out of

his cell between the prior searches and their request for a third search at 8:00 PM.  Correction Officers responded that they "will be back".

48.     At 1:00 AM on October 30, 2014, defendant, Camacho arrived at Mr. Yearde's cell with a team of officers including defendants Isnardi, Tatum, and John Does #1-#6, armed with body armor including vests, helmets, and shields.

49.     Defendant Camacho and his team stormed Mr. Yearde's cell and rushed him, throwing him down, striking his head on the ground, putting him in a chokehold, and throwing him on the bed.  After Mr. Yearde was handcuffed while on the bed, they proceeded to throw him to the ground again and punch, kick, and stomp Mr. Yearde's head and body and squeezing his testicles for several minutes, causing Mr. Yearde sever pain and suffering including a fracture of his humerus.

50.  During the raid of Mr. Yearde's cell, defendant Camacho was continually ordering Mr. Yearde to "stop resisting!" and ordering his team to "take him down!".  However, Mr. Yearde was not resisting or fighting in any way and replied to them that he was handcuffed and couldn't possibly resist.

51.     Defendant Camacho and his team then put Mr. Yearde in a holding pen for ten minutes while they extracted another inmate.

52.     Defendant Camacho and members of his team then took Mr. Yearde from the holding pen and conducted a body cavity search on him. They then dragged him down the stairs with no shoes on, causing his knees and feet to hit the steps on the way down, until finally arriving at the "main clinic".

53.     At the clinic, Mr. Yearde told the nurse that he believed that his arm was broken. The nurse responded, "Get the [expletive] out of my face, your arm is not broken".

54.     Defendant Camacho and his team then took Mr. Yearde back to his cell where he remained unattended to and in excruciating pain and with serious swelling in his arm from 2:00 AM until approximately 7:00 PM on October 30, 2014, despite his numerous pleas to officers to allow him to seek medical attention.

55.     At approximately 7:00 PM on October 30, 2014, DOC personnel, Captain Hill, observed Mr. Yearde crying in his cell.  She asked what was wrong and Mr. Yearde showed her his badly bruised and swollen arm.

56.     Captain Hill took Mr. Yearde to the "mini clinic" from which he was then directed to seek further treatment at the urgent care center in the West Facility.

57.     At the West Facility, an x-ray of Mr. Yearde was taken and he was diagnosed with a fractured humerus.

58.     After an hour or two in the West Facility, Mr. Yearde was finally transported to Bellevue hospital via the back of a van.  Mr. Yearde's arm was again x-rayed and he was again diagnosed with a fractured humerus, and his arm was put into a hard cast.

59.     Mr. Yearde was then released from Bellevue hospital and returned to GRVC.

60.     The following day, Mr. Yearde made a complaint about defendant Captain Camacho.


*Post-Assault Retaliatory Measures*


61.     Following the assault of Mr. Yearde on October 30, 2014, he continued to experience abuse from the individual defendants.  The harassment he had previously experienced was enhanced and he was continually subjected to verbal abuse, denial of showers and necessities,

and the officers continued to spit in Mr. Yearde's food.

62.     Correction officers also denied Mr. Yearde telephone calls.  They repeatedly took his PIN for telephone calls and allowed other inmates to use it to make phone calls.  Only after speaking to a Captain about the denials, Mr. Yearde was allowed one telephone call which was on November 17, 2014.

63.     On November 16, 2014, Mr. Yearde was meant to be taken to the main clinic for a checkup of his injuries sustained in the assault of October 30, 2014.

64.     Defendant Correction Officer Jefferson escorted Mr. Yearde to the mini clinic instead, but found that it was closed.

65.     Instead of taking Mr. Yearde to the main clinic, as instructed, defendant Jefferson attempted to take Mr. Yearde back to his cell.

66.     When Mr. Yearde stated that he was meant to go to the main clinic and attempted to convey same to a nearby Captain, defendant Jefferson twisted Mr. Yearde's arm and pulled it up to his back, turning Mr. Yearde around and moving him towards his cell, forcing him not to complain to the Captain.

67.     On the ground in front of Mr. Yearde's cell, defendant Jefferson slammed his face onto the ground and proceeded to push on Mr. Yearde's broken arm.  Mr. Yearde stated to defendant Jefferson that he was further injuring his broken arm and he was taken to intake.

68.     While in intake, Mr. Yearde encountered defendant Isnardi, who threatened Mr. Yearde that if he ever caught him asking for X-rays again, Isnardi and other officers would break his other arm.

69.     As a result of Mr. Yearde's fear of defendant Isnardi and of further retaliatory violence against him, Mr. Yearde continuously refused requests to be X-rayed for follow-up status

of his fracture, causing him to bear the untreated excruciating pain and furthering the permanence of his injury.

70.     Mr. Yearde was scheduled to be released from Rikers Island on December 4, 2014.

71.     On the morning of December 4, 2014, Mr. Yearde was subjected to yet another cavity search and his medication was thrown all around his cell by Correction Officers before being taken to an intake cell at approximately 8:00 AM to prepare for said release.

72.     Mr. Yearde was held until 12:00 PM that day, and was then taken back and forth to and from Building 6 multiple times.

73.     Mr. Yearde was told that GRVC was behind on paperwork.  He was finally released from Rikers Island on December 5, 2014 at approximately 1:00 PM, a full day later than his intended December 4th release.

### Mr. Yearde's Substantial Permanent Injuries

74.     After being released from Rikers Island, Mr. Yearde visited Bronx-Lebanon Hospital to meet with an orthopedist about his injuries.

75.     He was then referred to Essen Medical Associates where he began and continued rehabilitative treatment for his fractured arm.

76.     Mr. Yearde was caused to wear a cast and then a brace on his injured arm for approximately three and a half months from his initial October 31st visit to Bellevue Hospital.

77.     Mr. Yearde suffers constant pain in his injured arm daily and it has caused him to be unable to perform his usual daily activities.  Sometimes the pain and weakness in the arm is so unbearable that he can not hold his infant daughter in his arms.  He can not play with his daughter

comfortably.  He can no longer exercise and participate in sports activities including basketball, football, and boxing.

78.     Also, Mr. Yearde has been unable to return to being employed as a construction worker due to his arm injury and has found it difficult to find employment other than construction after having served time on Rikers Island, having endured a serious permanent injury to his arm, and having lower institutional education level than is often required.

79.     Within ninety days after the October 30, 2014 assault, a written Notice of Claim, sworn by Plaintiff, was served upon Defendants at the Comptroller's Office at 100 Church Street, New York, New York.

80.     At least thirty days have elapsed since the service of the Notice of Claim and adjustment or payment of the claim has been neglected or refused.

81.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## FIRST CLAIM FOR
## RELIEF

### 42 U.S.C. § 1983/Fourth and Fourteenth Amendments
### Excessive Force
### (Against All Individual Defendants and Supervisory
### Defendants)

82.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

83.     By reason of the foregoing, by assaulting, battering and using gratuitous, excessive, brutal, sadistic, and unconscionable force on Mr. Yearde, and by failing to prevent other defendants from doing so, and by failing to provide medical attention to Mr. Yearde when it was obvious that

he needed urgent medical care, the Individual Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution to be free from gratuitous and excessive force.

84.     The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment as DOC officers and employees. Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

85.     The Supervisory Defendants knew that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assaults on Plaintiff. Their failure to take measures to curb this pattern of brutality constitutes acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's beatings, and the failure of the Supervisory Defendants to take remedial action despite the fact that the misuse of force in City jails had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Plaintiff. The Supervisory Defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

86.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CLAIM FOR**

## RELIEF

**42 U.S.C. § 1983/Fourteenth Amendment Excessive Force**
**(Against Defendant City)**

87.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

88.     Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff brutality by DOC staff at the time of Plaintiff's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice, or custom and led to Plaintiff's assault.

89.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to a brutal beating, Defendant City has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the right to be free from gratuitous and excessive force guaranteed by the Fourteenth Amendment to the United States Constitution.

90.     As a direct and proximate result of the policy, practice, and custom detailed above, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM FOR
## RELIEF

**Assault**
**(Against Defendants City, Camacho, Isnardi, Tatum, Jefferson, Doe #1 – Doe #6)**

91.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

92.     By reason of the foregoing, and by threateningly approaching Plaintiff and aiming to strike and kick him, Defendants Camacho ,Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6, acting in their capacities as DOC officers and employees, and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of imminent offensive contact, and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

93.     The assault committed by Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6 was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

94.     Defendant City, as employer of Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6, is responsible for their wrongdoing under the doctrine of respondeat superior.

95.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**FOURTH CLAIM FOR
RELIEF**

**Battery
(Against Defendants City, Camacho, Isnardi, Tatum, Jefferson, Doe #1 – Doe #6)**

96.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

97.     By reason of the foregoing, and by intentionally punching and kicking Plaintiff, Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6, acting in their capacities as DOC officers and employees, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

98.     The battery committed by Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6 was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

99.     Defendant City, as employer of Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6, is responsible for their wrongdoing under the doctrine of respondeat superior.

100.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM FOR RELIEF

### Negligent Hiring/Training/Discipline/Retention of Employment Services (Against Defendant City)

101.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

102.     Defendant City, through the DOC, owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

103.     Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

104.     Upon information and belief, Defendant City knew or should have known through the exercise of reasonable diligence that the Individual Defendants were potentially dangerous.

105.     Upon information and belief, Defendant City's negligence in screening, hiring, training, disciplining, and retaining the Individual Defendants proximately caused each of Plaintiff's

injuries.

106.     As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CLAIM FOR
## RELIEF

### Negligent Failure to Provide Medical Treatment
### (Against Defendant City and Defendants Camacho, Isnardi, Tatum, Jefferson, Doe #1 – Doe #6)

107.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

108.     Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6 owed a duty of care to Mr. Yearde to provide him with access to medical treatment after he had been assaulted and while he was in the custody and care of the DOC, because under the same or similar circumstances, a reasonable, prudent and careful person should have anticipated that injury to Mr. Yearde or to those in a like situation would probably result from the failure to provide access to immediate medical treatment.

109.     Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6 allowed Mr. Yearde remain in his cell, despite constant complaints of pain, without providing him any medical treatment and without taking him to a doctor.

110.     Defendants Camacho, Isnardi, Tatum, Jefferson, and Doe #1 – Doe #6 knew, or should have known, that his failure to provide medical treatment to Mr. Yearde, or to take him to a doctor, for an extended period of time could and did exacerbate and worsen Mr. Yearde's condition, causing him severe injury.

111.     Defendant City, as employer of Defendants Camacho, Isnardi, Tatum, Jefferson, and

Doe #1 – Doe #6, is responsible for his wrongdoing under the doctrine of respondeat superior.

112.    As a direct and proximate result of the misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM FOR RELIEF

### False Imprisonment in Violation of the U.S. Constitution

113.    By their actions in this complaint, Defendants acted under color of state law to deprive Plaintiff of his right to be free from false imprisonment as guaranteed by the Fouth and Fourteenth Amendments of the U.S. Constitution, as enforced by U.S.C. § 1983, for the time period between December 4, 2014 and December 5, 2014.

## EIGHTH CLAIM FOR RELIEF

### False Imprisonment in Violation of New York law

114.    Defendants subjected Plaintiff to false imprisonment in violation of the laws of New York State, since the Plaintiff was wrongfully, unlawfully, unjustifiably, and forcibly detained and deprived of his liberty against his will, for the time period between December 4, 2014 and December 5, 2014.  Defendants did so while acting as employees of the City of New York, in the course of their employment and the scope of their authority in furtherance of the interest of their employer.

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

A.      Compensatory damages in an amount to be determined at trial for the physical and

psychological injuries sustained by Mr. Yearde as a result of the events alleged herein.

B.      Punitive damages against the Individual Defendants and Supervisory Defendants in

an amount to be determined at trial.

C.      An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this

action.

D.      Such other and further relief as the Court may deem appropriate.

Dated:  January 26, 2016
        Brooklyn, New York

                                        SARTA & SCARPATI, LLP

                                        ____/s/ Nicholas M. Sarta_____
                                        Nicholas M. Sarta, Esq.
                                        7317 – 13th Avenue
                                        Brooklyn, New York 11228
                                        (718) 232-3330
                                        Attorneys for Plaintiff